| | |
|---|---|
| **LOANDEPOT.COM,** | Civ. No. 18-12091 (KM) (JBC) |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **CROSSCOUNTRY MORTGAGE, INC.** et al. | |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

Now before me is the motion of defendant CrossCountry Mortgage, Inc. ("CrossCountry"), (DE 35) and the motion of defendants Matthew Reid and Andrea Manara, (DE 36), to dismiss Counts 8, 10, 15, 18, and 19 of the Amended Complaint. Defendants Reid and Manara rest on the arguments of Defendants CrossCountry. (*Id.*). In an opinion and order filed today, I referred the claims against the other defendant, Justin Lieberman, to arbitration. Thus "Defendants," as used in this opinion, excludes Lieberman and refers only to the moving Defendants. For the reasons set forth below, I will grant in part and deny in part the Defendants' motions to dismiss.

# I.    Summary[1]

## a. Facts[2]

### i. Parties

Plaintiff loanDepot is a limited liability company in the business of making home mortgage, home equity, and personal loans. (1AC ¶ 1). It is organized under the laws of the State of Delaware and has its principal place of business at Foothill Ranch, California. (*Id.*). All the members of loanDepot are residents of the State of California. (*Id.*). The company employs 6,500-plus team members across the country and operates 180-plus local loan locations nationwide. (*Id.* ¶ 2).

Defendant CrossCountry is a corporation that, according to its website, offers "a wide portfolio of home purchase, refinance, and home equity products." (*Id.* ¶ 3). It is organized under the laws of the State of Ohio and has its principal place of business at Brecksville, Ohio. (*Id.*). CrossCountry has locations in all 50 states, including multiple locations in the State of New Jersey, including Cranford. (*Id.*). CrossCountry is a direct competitor of loanDepot. (*Id.*).

Defendant Reid was employed by loanDepot and its predecessors from 2010 until he resigned on June 8, 2018. (*Id.* ¶ 4). While employed by loanDepot, Reid was a Branch Manager and Mortgage Loan Originator at loanDepot's office in New City, New York. (*Id.*). Reid's responsibilities at loanDepot included originating and closing home mortgage and home equity loans. (*Id.*). Reid is currently employed by CrossCountry as a Branch Manager at its office in Cranford, New Jersey. (*Id.*).

Defendant Manara was employed by loanDepot from January 10, 2017, until she resigned on June 13, 2018. (*Id.* ¶ 5). While employed by loanDepot,

---

[1]    For purposes of the motion to dismiss, the factual allegations of the amended third-party complaint are taken as true. *See* Section II.a, *infra.*

[2]    For ease of reference, the (1st) Amended Complaint [DE 33] will be cited as "1AC".

Manara was Reid's Sales Assistant at loanDepot's office in New City, New York. (*Id.*). Manara is currently employed as a Sales Assistant reporting to Reid at CrossCountry's office in Cranford, New Jersey. (*Id.*).

Defendant Lieberman[3] was employed by loanDepot and its predecessors until he resigned on February 10, 2017. (*Id.* ¶ 6). While employed by loanDepot, Lieberman was a Branch Manager at loanDepot's office in Cranford, New Jersey. (*Id.*). Lieberman's responsibilities at loanDepot included originating and closing home mortgage and home equity loans, as well as supervising mortgage loan officers. (*Id.*). Lieberman is currently employed by CrossCountry as a Branch Manager at its office in Cranford, New Jersey. (*Id.*).

### ii. CrossCountry's scheme

CrossCountry has used former loanDepot employees to solicit loanDepot employees to work for CrossCountry. (1AC ¶ 16). Specifically, CrossCountry has targeted loanDepot's New York, New Jersey, and Connecticut region ("NNC Region"). (*Id.*). CrossCountry assists and encourages incoming employees, while still at loanDepot, to slow or stop the process on home mortgage and home equity loans so the employees may bring the business with them to CrossCountry. (*Id.*). To facilitate this process, loanDepot employees transfer confidential and private customer information outside the company. (*Id.*).

CrossCountry orchestrated the resignation of Defendants Reid and Manara (the latter through Reid) and, upon loanDepot's "information and belief," other unnamed loanDepot employees, through a series of onboarding and recruiting activities. (*Id.* ¶ 13). CrossCountry conducted "pre-transition strategy sessions" to plan and orchestrate the employees' resignations from loanDepot, their expedited removal of confidential client information and files, and the conversion of loanDepot customers to CrossCountry customers. (*Id.* ¶ 13(a)). To facilitate the transfer of customers, CrossCountry provided a "referral desk" and "referral" staff. (*Id.* ¶ 13(c)). In addition, CrossCountry

---

[3]     The claims against Lieberman have been sent to arbitration by opinion and order filed today.

prepared advertising and marketing materials based on loanDepot's customer lists and resources. (*Id.* ¶ 13(f)). To assist in the transition, CrossCountry provided a "migration team," (*id.* ¶ 13(b)), and provided its licensing department to assist the employees, while still at loanDepot, in transferring their licenses to CrossCountry. (*Id.* ¶ 13(e)). Further, CrossCountry provided the employees with CrossCountry e-mail accounts and business cards while they were still at loanDepot. (*Id.* ¶ 13(d)).

 CrossCountry used bonus programs to encourage Defendant Reid and nonparty former loanDepot employees Christopher Albanese ("Albanese"), Peter Costakos ("Costakos"), and Peter Lucia ("Lucia"), who had been Loan Officers, to recruit loanDepot employees in violation of their non-solicitation obligations. (*Id.* ¶ 14). For example, Defendant Reid was paid a $250,0000 sign-on bonus upon formal employment with CrossCountry. (*Id.* ¶ 18). Furthermore, upon loanDepot's "information and belief," CrossCountry offered the former loanDepot employees indemnification from suits by loandDepot. (*Id.* ¶ 15).

 On February 10, 2017, Lieberman, Albanese, Costakos, and Lucia resigned from loanDepot and immediately became employees of CrossCountry. (*Id.* ¶ 18). Those defendants and nonparties have solicited, (*Id.* ¶ 17), and continue to solicit, (*id.* ¶19), loanDepot employees to leave loanDepot to work for CrossCountry. Since then, CrossCountry has successfully recruited at least 23 loanDepot employees from the NNC Region. (*Id.* ¶ 18).

### iii. Reid and Manara

 loanDepot alleges on "information and belief" that individual defendants began working for CrossCountry before resigning from loanDepot. (1AC ¶ 20). Specifically, loanDepot alleges the following:

 CrossCountry allegedly provided Reid and Manara with a CrossCountry e-mail account while Reid was still working for and employed by loanDepot. (*Id.* ¶ 22). loanDepot also alleges, "upon information and belief," that CrossCountry provided Reid with CrossCountry business cards while Reid was still working for and employed by loanDepot. (*Id.* ¶ 23).

During the last month of Reid's employment with loanDepot, between May and June 8, 2018, Reid began to stop originating and processing for loanDepot. (*Id.* ¶ 21). In that period, Reid began e-mailing private customer information and loan-related documents to himself at his private Hotmail e-mail account. (*Id.* ¶ 25).

On May 1, 2018, Reid e-mailed himself at his loanDepot e-mail address the "April Pipeline." That document included the names of 57 customers and loan information, representing nearly $19 million worth of business. (*Id.* ¶ 26).

On May 11, 2018, Reid sent to his Hotmail account a loan pre-approval for $325,000 for R&J R. (The Amended Complaint refers to customers by their initials to keep their privacy.) (*Id.* ¶ 27). That same day, Reid sent a loan pre-approval for $650,000 for customers JS and SS to his Hotmail account. (*Id.* ¶ 28).

On May 13, 2018, Reid sent to his Hotmail account several confidential personal documents, including tax returns and earning statements, of customer DH. (*Id.* ¶ 29).

On June 8, 2018, Reid sent to his Hotmail account information on a new loan customer, TS. (*Id.* ¶ 30). That same day, Reid sent to his Hotmail account copies of several executed residential sales contracts. (*Id.* ¶¶ 31–34).

All but one of the above-described loans disappeared from loanDepot's portfolio after Reid resigned. (*Id.* ¶ 35).

On May 14, 2018, Reid e-mailed Lieberman, then a CrossCountry employee, a copy of Reid's Branch Manager Dashboard Report with data current as of December 24, 2017. (*Id.* ¶ 37).

On June 6, 2018, Reid e-mailed Manara with the instructions to "[s]tart overnighting files to clients that closed," and asked, "can you send me a list of what is in drawer?" (*Id.* ¶ 38). In response, Manara e-mailed Reid a list of 55 customers. (*Id.* ¶ 39). In reply, Reid stated, "Wow ok we need to likely bring a lot of these with us. Oringinals [sic] keep it overnight. If copies make sure we have them scanned and shred." (*Id.* ¶ 40).

On June 8, 2018, Reid sent an inquiry e-mail regarding an updated loan preapproval for customer whose loan did not note close at loanDepot, but loanDepot infers that it closed at CrossCountry. (*Id.* ¶ 42).

On June 11, 2018, Reid began working at CrossCountry. (*Id.* ¶ 43). loanDepot asserts, "upon information and belief," that Reid continued to transfer loanDepot's customers and confidential information to CrossCountry. (*Id.*).

From June 11 through June 14, 2018, Reid was not licensed by the State of New Jersey as a mortgage officer. (*Id.* ¶ 44). From June 11 through June 18, 2018, Reid was not licensed by the State of New York. (*Id.* ¶ 45).

On June 18, 2018, loanDepot discovered several e-mails addressed to Reid from customers or their agents inquiring about the status of or providing information about loans that were in process, but did not appear in loanDepot's records. (*Id.* ¶ 46).

On June 27, 2018, loanDepot discovered a loan for customer RH. Closing, originally scheduled for May 27, 2018, was delayed by Reid until July 13, 2018. (*Id.* ¶ 47).

On June 28, 2018, loanDepot discovered that, on May 24, 2018, Reid had withdrawn a pending loan application for customers TB and LB and redirected it to CrossCountry. (*Id.* ¶ 48).

On June 29, 2018, loanDepot received a title insurance commitment for a purchase being made by customer TS, whose information Reid had forwarded to his own Hotmail address. (*Id.* ¶ 49). TS's purchase did not close at loanDepot. (*Id.*).

Upon leaving loanDepot, Reid took with him the computer that he used to conduct business while at the company. (*Id.* ¶ 51). Reid solicited Defendant Manara, as well as nonparties Maria Noeldechen and Colleen Polson, to leave loanDepot and join him at CrossCountry. (*Id.* ¶¶ 53–55).

When Manara discussed her resignation with loanDepot Vice President Mark McGowen, she falsely told McGowen that she was leaving the company to

work for her father. (*Id.* ¶ 56). loanDepot alleges that Manara deliberately intended to deceive McGowen so that she could funnel information to Reid before her own resignation became effective on June 13, 2018. (*Id.*).

According to loanDepot, "upon information and belief," CrossCountry offered to indemnify "one or more" of Reid, Albanese, Costakos, and Lucia for any damages or judgments caused by their conduct in these events. (*Id.* ¶ 57).

### iv. Key Employee Agreement

On January 16, 2015, Reid electronically signed a Key Employee Agreement with loanDepot (doing business as Mortgage Master), which was effective January 1, 2015. (1AC ¶ 58). Albanese, Costakos, and Lucia each signed a Key Employee Agreement identical to that of Reid. (*Id.* ¶ 63). The Key Employee Agreement included provisions related to non-solicitation and confidentiality, discussed below. The Key Employee Agreement stated that "Employer shall be entitled to equitable relief from any court of competent jurisdiction," that "monetary damages will be an inadequate remedy for Employer," and that "Employee shall be responsible for all losses, costs and expenses incurred by Employer, including reasonable attorney fees, incurred by reason of Employee violating" §7, the employee non-solicitation provision. (*Id.* ¶ 62) (Key Employee Agreement §15).

### 1. Non-solicitation provisions

Under the Key Employee Agreement, Reid agreed to comply with the two non-solicitation related provisions. First, to "devote [his] full business time, attention, best efforts, skill and ability exclusively to the business of Employer," and "[t]o do his[] utmost to further enhance and promote the business and welfare of Employer." (1AC ¶ 60) (citing Key Employee Agreement §4(a), (d)). Second, for the term of his employment and two years thereafter, he agreed he would not "directly or indirectly, influence or advise any person who is, or shall be, in the service of Employer to leave the service of Employer." (*Id.* ¶ 61) (citing Key Employee Agreement §7(c)).

## 2. Confidentiality provisions

Reid also agreed to certain confidentiality provisions in the Key Employee Agreement.

Section 3 of the Agreement provides as follows:

> Employee agrees that all non-public information related to Employer's business or Employer's customers, brokers, or loan investor contacts and sources, including but not limited to the Employer's business methods, product pricing, financial information, identity and lists of customers (other than those brought to Employer by Employee, or developed by Employee while employed) and brokers, loans, loan files and contents of same, that Employee learns of, is given access to, or develops, while employed by Employer (collectively, "Confidential Information") is and shall remain without time limit the sole and exclusive property of Employer regardless of how, why or when Employee's employment by Employer ends; that Employer has invested substantial amounts of money in developing and maintaining Confidential Information; that Employee is only permitted to use Confidential Information while employed by Employer and only to the extent needed to perform Employee's job functions and for no other reason; that Employee may not use Confidential Information for any reason whatsoever upon ceasing to be employed by Employer; and that upon ceasing to be employed for any reason by Employer, Employee shall return to Employer all physical and electronic copies of all Confidential Information.

(1AC ¶ 67) (citing Key Employee Agreement § 3)).

The Key Employee Agreement also provides "[t]hat all loans registered with, processed by or applied for with Employer constitute Confidential Information," and that "[a]ll loan applications and loan files shall constitute Confidential Information." (*Id.* ¶ 68) (citing Key Employee Agreement §4(c)). Further, the Agreement provides that Employer's "computer software and the contents, files and materials contained thereon or therein or on any such other property" provided to the Employee is "Confidential Information." (*Id.*) (citing Key Employee Agreement §13). During the term of their employment and thereafter, employees are prohibited from "communicating to or use for the benefit of any person, any Confidential Information of Employer nor to disclose

the proprietary methods of conducting the business of Employer." (*Id.* ¶ 69) (citing Key Employee Agreement § 7(a)).

### v. Branch Operator Agreement

On July 15, 2011, Lieberman signed a Branch Operator Agreement, in consideration of becoming branch supervisor of loanDepot's branch in Aberdeen, New Jersey. (1AC ¶ 64). The Branch Operator Agreement's non-solicitation and confidentiality provisions are similar to those in the Key Employee Agreement. (*Id.* ¶¶ 64, 71). Further, in the Branch Operator Agreement, Lieberman agreed and accepted responsibility for knowing the contractual obligations of loanDepot's Mortgage Loan officers. (*Id.* ¶ 65).

### vi. Employee handbook

The loanDepot employee handbook contains a Confidential and Consumer Information Section:

> Our customers entrust us with their private and personal financial information, and they expect us to maintain that information in a confidential and secure environment.
>
> Today, technology enables us to maintain more information about customers. Recognizing this, the Company has placed special emphasis on the appropriate collection, storage, and use of customer information. Your role in privacy protection is critical.... Should you at any time become aware of, or suspect that a data breach has occurred, you must immediately notify your manager and IT. Questions about these policies should be directed to Information Technology and/or Human Resources.

(1AC ¶ 72) (loanDepot Employee Handbook, Ex. P to Am. Compl., p.17).

### vii. Cease-and-desist letter

On or about June 13, 2018, loanDepot sent a cease-and-desist letter to Reid, based on its belief that Reid had unlawfully taken and was using loanDepot's confidential information for CrossCountry's benefit. (1AC ¶ 73). The letter reminded Reid of his post-employment obligations and demanded that Reid cease these activities. (*Id.*). After listing Reid's obligations, the letter made several demands, including that Reid provide written assurance of his

post-employment obligations. (*Id.*). loanDepot reserved its rights to pursue action if any of the following occurred: if Reid did not provide the written assurances, if loanDepot confirmed any further violations, or if Reid acted in a way loanDepot viewed unlawful. (*Id.* ¶ 73).

CrossCountry's Chief Legal Counsel was copied on the cease-and-desist letter to Reid. (*Id.* ¶ 74). Reid did not respond to loanDepot's cease-and-desist letter, (*id.* ¶ 76), but on June 20, 2018, CrossCountry's Associate Corporate Counsel responded, rejecting the allegations without discussion. (*Id.* ¶ 75).

On February 20, 2017, loanDepot had sent similar letters to Lieberman, Costakos, Lucia, and Albanese, all of whom had resigned from loanDepot and joined CrossCountry on or about February 10, 2017. (*Id.* ¶ 77). None of those recipients responded to their letters. (*Id.* ¶ 79).

### viii. CrossCountry's post-complaint actions

According to loanDepot, after this action was filed and CrossCountry became aware of the allegations in the first filed complaint, CrossCountry "doubled-down on its raiding." (1AC ¶ 81).

loanDepot alleges, "upon information and belief," that Lieberman recruited non-party and Mortgage Loan Officer Tom Mellett, who resigned from loanDepot on August 3, 2018 and now works at CrossCountry. (*Id.* ¶ 82). Like Reid, Mellett began working for CrossCountry before resigning from loanDepot, (*id.* ¶ 83), and, according to loanDepot's "information and belief," was given CrossCountry business cards and an e-mail account. (*Id.* ¶ 84).

loanDepot also alleges that Lieberman and Costakos recruited non-party and Mortgage Loan Officer Evan Templeman in violation of Costako's contractual obligations. (*Id.* ¶ 85). On August 17, 2018, Tempelman resigned his employment at loanDepot. (*Id.*). After Tempelman joined CrossCountry, Lieberman admitted that he had been encouraging loanDepot employees to join CrossCountry. (*Id.* ¶ 86).

On or about August 10, 2018, Lieberman scheduled a lunch with his former loanDepot colleague, Steve Tandy, who is a Branch Manager of

loanDepot's office in Garden City, New Jersey. (*Id.* ¶ 87). When Tandy arrived at the lunch, he was met by Lieberman, Reid, and Lucia. (*Id.*). The purpose of the lunch was to recruit Tandy to move his entire branch to CrossCountry. (*Id.*).

loanDepot alleges that, "upon information and belief," CrossCountry continues to recruit loanDepot employees and that the identities of those individuals will be revealed during discovery. (*Id.* ¶ 88).

### b. Procedural history

On July 26, 2018, loanDepot filed a Complaint (DE 1), attaching an application for temporary restraints and injunctive relief. (DE 1-2, 1-3). On July 27, 2018, this Court denied loanDepot's application for temporary restraints, and ordered defendants CrossCountry, Matthew Reid, and Andrea Manara to appear before the Court to show cause why the Court should not enter an order granting loanDepot its requested injunctive relief. (DE 5, 6, 7). On August 1, 2018, loanDepot withdrew its application for order to show cause and motion for preliminary injunction. (DE 9, 10, 11).

On October 19, 2018, loanDepot filed this Amended Complaint. (DE 33). The Amended Complaint contains nineteen counts. (*Id.*). I describe only those counts subject to the motion to dismiss:

- **Count Eight:** tortious interference with the contracts of Reid, Christopher Albanese, Peter Costakos, Peter Lucia, and "others" with loanDepot
- **Count Ten:** employee piracy
- **Count Fifteen:** unfair competition
- **Count Eighteen:** fraudulent concealment of evidence
- **Count Nineteen:** conspiracy to fraudulently conceal evidence

(1AC).

On November 2, 2018, CrossCountry filed a partial motion to dismiss the Amended Complaint. (DE 35). On that same date, Manara and Reid submitted their own partial motion to dismiss (DE 36), attaching the declaration of

defense counsel Keven W. Weber, stating that no separate brief is necessary and joining in the argument of CrossCountry. (De 36-1 ¶ 4).

On November 27, 2018, defendant Lieberman filed a motion to compel arbitration and stay this action under 9 U.S.C. § 3. (DE 44). On the same date, CrossCountry filed a motion supporting Lieberman's motion to compel arbitration and seeking to stay all claims (not just those against Lieberman). (DE 45). By order and opinion filed today, I granted Lieberman's motion to compel arbitration and stay the claims against himself. I denied CrossCountry's motion to stay the claims against itself.

## II.    Discussion

### a.    Legal standard

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also West Run Student Housing Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

### b. Analysis

Defendants have moved to dismiss a portion of Count Eight and the entirety of Counts Ten, Fifteen, Eighteen and Nineteen. I address them in order.

### i. Count Eight

Count Eight of the Amended Complaint asserts a claim that CrossCountry and Lieberman tortiously interfered with contracts between loanDepot and a number of its employees. (1AC p. 28).

Under New Jersey law, a claimant alleging tortious interference with contractual relations must allege: "(a) the existence of a contract, (b) intentional interference, with malice, (c) loss [or breach] of the contract, and (d) damages." *ThermoLife Int'l LLC v. Connors*, No. CIV. 2:13-4399 KM, 2014 WL 1050789, at \*3 (D.N.J. Mar. 17, 2014) (citing *Velop, Inc. v. Kaplan*, 301 N.J. Super. 32, 49, 693 A.2d 917, 926 (N.J.Super.Ct.App.Div.1997) (citing *Printing Mart–Morristown v. Sharp Electronics*, 116 N.J. 739, 563 A.2d 31 (N.J.1989)). *See also Oakwood Labs., LLC v. Thanoo*, No. 17-CV-05090(PGS), 2018 WL 2973384, at \*6 (D.N.J. June 12, 2018) (listing the same elements).

Count Eight is titled "Tortious Interference with the Contracts of Reid, Albanese, Costakos, and Lucia with loanDepot." Within the count, however, other employee contracts are cited. There is an allegation "upon information and belief," that Cross Country and Lieberman knew of the Key Employee Agreement between LoanDepot and Reid, as well as the Company's agreements with Tempelman, Mellet, Albanese, Costakos, Lucia, and "others." (*Id.* ¶ 125). loanDepot further alleges that CrossCountry "intentionally and without justification" interfered with these contractual relationships and encouraged Reid, Tempelman, Mellet, Albanese, Costakos, Lucia, and "others" to breach their agreements. (*Id.* ¶ 126). To this day, loanDepot claims, CrossCountry

continues to encourage and induce those individuals to continue those breaches. (*Id.*). loanDepot claims to have suffered injury, damages, and irreparable harm. (*Id.* ¶ 127).

### 1. Lumpers and splitters

Before addressing the contracts individually, I consider and reject two blanket objections to Count Eight, one raised by loanDepot and the other by CrossCountry. loanDepot seems to argue that the Count must be upheld as a whole, because it contains one or more legitimate claims, and that its allegations should not be split off and analyzed separately. Cross Country argues that the Count must be dismissed in part because it contains illegitimate claims, or as a whole because it lumps allegations together *via* "group pleading."

loanDepot posits that Cross Country may only seek to dismiss a count, not individual allegations within a count. Thus, says loanDepot, the tortious-interference allegations cannot be dismissed as to the contracts of only some of employees named in the count. (DE 43, pp. 9–11). I reject that all-or-nothing approach. Courts in this circuit have routinely dismissed sub-theories contained within a claim while allowing other sub-theories to survive. *See e.g., Ciecka v. Rosen*, 908 F. Supp. 2d 545, 560 (D.N.J. 2012) (granting a motion to dismiss a tortious interference claim only to the extent it asserted a particular theory); *Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*, No. CV 15-137-LPS-CJB, 2017 WL 1349175, at *7 (D. Del. Apr. 10, 2017) (allowing an inequitable conduct counterclaim to be broken down into theories in caution that a different ruling would allow a "single viable theory to 'carry' otherwise wholly deficient theories of liability through to the summary judgment stage," and listing other courts that have ruled similarly). Other courts have treated a portmanteau claim as comprising severable claims of interference with distinct contracts. *See, e.g., Glob. Fleet Sales, LLC v. Delunas*, No. 12-15471, 2014 WL 634075, at *15–17 (E.D. Mich. Feb. 18, 2014) (treating a count for tortious interference of six specific contracts as asserting six individual claims). I do not

agree that bundling of good and bad claims should shield inadequate allegations from scrutiny and permit them to go forward despite the pleading standards of Rule 8. In an appropriate case, I will exercise my discretion to dismiss severable components of a single count.

Cross Country, for its part, objects that Count Eight must be dismissed because it constitutes impermissible "group pleading." I disagree. (DE 35-1 pp. 11 – 12) (citing *Sheeran v. Blyth Shipholding S.A.*, No. CV 14-5482 (JBS/AMD), 2015 WL 9048979, at *3 (D.N.J. Dec. 16, 2015)). This Count does not attribute wrongdoing indiscriminately to multiple parties, the evil addressed by *Sheeran*. Count Eight names two defendants: CrossCountry (a corporation, which can act only through individuals) and Lieberman. It alleges that they have committed multiple, similar acts of tortious interference as part of a strategy to pirate loanDepot employees. Count Eight appears to me to be an appropriate unit of litigation; it is not necessary to split it into five, six, or seven claims asserting the same cause of action.

### 2. The individual contracts

CrossCountry's motion calls for dismissal, in part, of Count Eight. It argues that Count Eight "should be dismissed as to Messrs. Albanese, Tempelman, Lucia, and 'others.'"[4]

**Albanese and Tempelman**: As to tortious interference with the contracts of Albanese and Tempelman, CrossCountry argues that the allegations of (induced) breach lack the factual specificity and plausibility required to survive a motion to dismiss.

---

[4]     Cross Country's brief makes no argument with respect to the contracts of Costakos and Mellet. The allegations of Count Eight with respect to Costakos and Mellet will therefore remain intact. I do not address their sufficiency.

Defendants Reid and Manara make no independent arguments, but join in the arguments of defendant CrossCountry "to the extent they are applicable." (DE 36-1). CrossCountry's brief makes no arguments as to the sufficiency of Count Eight with respect to Reid. I will not construct an argument as to how its arguments might be retrofitted to the distinct factual allegations regarding Reid. Reid's motion to dismiss Count Eight based on interference with his own contract is therefore denied. Manara is not named, even in passing, in Count Eight, and does not move to dismiss it.

I consider two possible allegations of breach.

First, the Amended Complaint alleges that Albanese and Tempelman, responding to blandishments and financial incentives from Cross Country, have left loanDepot. (1AC ¶ 18). Albanese is alleged to have signed the loanDepot Key Employee Agreement, which contains non-solicitation and confidentiality clauses. (*Id.* ¶¶ 58–63 (describing similar Key Employee Agreements signed by Albanese and others)). Moving to another company, however, is not in itself a breach of those provisions. As to Tempelman, the complaint does not even explicitly describe his agreement with loanDepot or allege that it contained non-solicitation or confidentiality clauses similar to those in the Key Employee Agreement.

The second potential breach might consist of the Amended Complaint's broad allegation that Albanese and several others (but not Tempelman) breached their agreements by soliciting unidentified loanDepot employees at unspecified times. (*See* 1AC ¶¶ 14–19). Those allegations are too vague to set forth a specific breach of Albanese's contract.

Count Eight is dismissed to the extent it purports to allege claims of tortious interference with respect to the contracts of Albanese and Tempelman.

**Lucia:** As to the alleged tortious interference with Lucia's contract, CrossCountry argues that Count Eight fails to allege a breach and resulting injury or damages.

As to the alleged breach, the Amended Complaint makes the same broad assertion that Lucia and others have solicited unidentified loanDepot employees at unspecified times. (1AC ¶ 14–19). As to Lucia in particular, however, the Amended Complaint adds that, on August 10, 2018, he attempted to recruit loanDepot employee Steve Tandy to join CrossCountry. Count Eight thus makes a sufficiently factual allegation that defendants induced a breach of Lucia's nonsolicitation covenant.

Nevertheless, says CrossCountry, the element of injury is absent, because Tandy is still employed at loanDepot. (DE 35-1 p. 15 (citing Am. Compl. ¶ 87). In support, CrossCountry relies on the analogous authority of

*Barrows v. Chase Manhattan Mortg. Corp.*, 465 F.Supp.2d 347, 368 (D.N.J. Dec. 8, 2016). *Barrows,* however, is a far more clear-cut case. There the court held that the plaintiff lacked standing to sue for attorneys' fees because she did not pay attorneys' fees. (*Id.*). An unsuccessful solicitation attempt, to be sure, is probably less injurious than a successful one. I cannot say at this early stage, however, that the injury from an unsuccessful solicitation attempt is zero as a matter of law. The motion to dismiss Count Eight is therefore denied as to tortious interference with Lucia's contract.

### Unnamed "Others."

Count Eight adds an allegation that CrossCountry and Lieberman have tortiously interfered with the contracts of unnamed "others." Such allegations must be dismissed for failure to identify the contract at issue. *See Debjo Sales, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, Civ. No. 14-4657, 2015 WL 1969380, at *7 (D.N.J. Apr. 29, 2015) (dismissing a claim for tortious interference when the plaintiff "failed to identify valid relevant contracts with reasonable specificity"). The motion to dismiss Count Eight is granted as to these unnamed "others."

All of the foregoing dismissals with respect to Count Eight are entered without prejudice to an appropriate and timely motion to amend.

### ii. Count Ten

Count Ten asserts a claim against CrossCountry, Reid and Lieberman for employee piracy. Count Ten claims that CrossCountry, Reid, and Lieberman have combined to raid loanDepot's employees with the intent to injure loanDepot. (1AC ¶ 135). CrossCountry allegedly deprived loanDepot of experienced employees and revenue, and built up its own workforce and customer base with what it took from loanDepot. (*Id.*). In consequence, loanDepot must recruit and train new employees. (*Id.*).

A claim of employee piracy is in substance, if not in name, a claim for tortious interference with employment contracts or a claim of tortious interference with economic advantage. *See e.g., Cardionet, Inc. v. Medi-Lynx*

*Cardiac Monitoring, LLC,* No. CV158592MASTJB, 2016 WL 4445749, at *2
(D.N.J. Aug. 22, 2016); *Avtec Indus., Inc. v. Sony Corp. of Am.,* 500 A.2d 712,
715 (App. Div. 1985). The elements of tortious interference with contract are
set forth above. The elements of tortious interference with economic advantage
are (1) a "reasonable expectation of economic advantage"; (2) interference done
intentionally and with malice; (3) injury, in the sense of the loss of prospective
gain; and (4) damages. *MacDougall v. Weichert,* 677 A.2d 162, 174 (1996). I
highlight, however, that "[t]he mere persuasion of an employee to change jobs
is not wrongful; but if it is done to injure the employer, it is wrongful."
*Cardionet,* 2016 WL 4445749, at *2 (citing *Avtec Indus.,* 500 A.2d at 715).

CrossCountry argues that Count Ten should be dismissed because it
duplicates the legal theory stated in loanDepot's other claims, particularly
those in Counts One, Two, Five, and Eight. (DE 35-1 pp. 17–19). At the motion
to dismiss stage, I will generally respect a party's entitlement to plead claims in
the alternative. *See Howmedica Osteonics Corp. v. NuVasive, Inc.,* No.
CV177906KMSCM, 2018 WL 6011936, at *5 (D.N.J. Nov. 15, 2018). At any
rate, the theories are distinct. Unlike Count Eight, Count Ten (at least in its
economic-advantage aspect) does not necessarily rely on the employees' breach
of their contracts with loanDepot. Unlike Counts One, Two, and Five, Count
Ten focuses on the conduct of defendants as competitors, in addition to their
exercise of influence over the conduct of employees of loanDepot. Thus Count
Ten potentially has something to add, and it will not be dismissed as
duplicative at this stage.

The motion to dismiss Count Ten is denied.

### iii. Count Fifteen

Count Fifteen asserts a claim against all defendants for unfair
competition, citing a number of acts adverse to the interests of loanDepot:

> misappropriating its trade secrets, confidential information, and
> proprietary information . . . interfering with its existing and
> prospective customer relationships, its contracts, and its
> employment relationships; . . . improperly capitalizing on the
> goodwill of loanDepot; and . . . employing unfair and deceptive

practices intended to hinder delay, divert, or prevent loanDepot from
fairly competing with Defendants.

(1AC ¶ 178).

CrossCountry argues that Count Fifteen should be dismissed as
duplicative of loanDepot's claims of tortious interference and misappropriation
of trade secrets. (DE 35-1 pp. 20–21).

loanDepot does not deny that Count Fifteen duplicates the tortious
interference and misappropriation claims. (DE 43 pp. 11–13). Rather,
loanDepot argues that this is permissible; unfair competition claims may be
made up of other claims, such as, for example, tortious interference and
breach of the duty of loyalty. (*Id.* pp. 12–13) (citing *Lamorte Burns & Co. v.
Walters*, 167 N.J. 285 (2001) (affirming summary judgment on an unfair
competition claim even where the proofs required were subsumed by claims of
tortious interference and breach of duty of loyalty); *Avaya Inc., RP v. Telecom
Labs, Inc.*, 838 F.3d 354, 386 n. 30 (3d Cir. 2016) (observing that other
business torts may support an unfair competition claim).

An unfair competition claim may turn out to be superfluous. I will not,
however, dismiss it at the pleading stage. The motion to dismiss Count Fifteen
is denied.

### iv. Count Eighteen

Count Eighteen, brought against CrossCountry, Reid, and Manara,
asserts a claim of fraudulent concealment of evidence. It alleges that the
defendants had a legal obligation to preserve, disclose, and produce various
documents as evidence, but have withheld and destroyed those materials. (1AC
¶¶ 189–203). Broadly, the alleged fraudulent activity is the "shredding,
wrongful withholding, destruction, and rendering irretrievable" of the following
materials:

    a. "Reid's laptop computer, which he used to improperly transfer
loanDepot clients to CrossCountry, misappropriate loanDepot's
Confidential Information to CrossCountry, and transfer the

confidential financial information of loanDepot's clients to CrossCountry, and the ESI residing on Reid's laptop computer relating to the allegations in this case;"

b. "Documents, files and records, which Manara shredded at Reid's written direction;" and

c. "Other documents and ESI, which will be identified during the discovery process in this litigation."

(1AC ¶ 191). Reid allegedly instructed Manara to shred loanDepot records, knowing that litigation with loanDepot was foreseeable. (*Id.* ¶¶ 193–96). It is further alleged that CrossCountry falsely denied that Reid or Manara took any confidential information from loanDepot and that CrossCountry "rejected loanDepot's request to inspect Reid's laptop computer." (*Id.* ¶ 197). Furthermore, upon loanDepot's "information and belief," Defendants "hid, withheld, deleted, and/or rendered irretrievable ESI and metadata that would provide documentary evidence that Defendants committed the wrongful acts." (*Id.* ¶ 201). Further, loanDepot "had to undertake significant additional expense in an effort to obtain the Discovery Materials, most of which are still in the process of being recovered due to Defendants' ongoing fraudulent concealment of evidence." (*Id.* ¶ 199).

Fraudulent concealment, or spoliation, refers to "the hiding or destroying of litigation evidence, generally by an adverse party." *Rosenblit v. Zimmerman*, 766 A.2d 749, 754 (2001). A litigant is permitted to file a separate tort claim for fraudulent concealment against an adversary that conceals or destroys evidence during or in anticipation of litigation. *Tafaro v. Six Flags Great Adventure, LLC*, Civ. No. 17-5607, 2018 WL 1535289, at *6 (D.N.J. Mar. 29, 2018) (Wolfson, J.) (citing *id.* at 403, 406 – 407; *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 320 (3d Cir. 2014)). Such a spoliation claim has five essential elements:

(1) Defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with an existing or pending litigation;

(2) The evidence was material to the litigation;

(3) Plaintiff could not reasonably have obtained access to the evidence from another source;

(4) Defendant intentionally withheld, altered or destroyed the evidence with purpose to disrupt the litigation; and

(5) Plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed.

*Rosenblit*, 166 N.J. at 406–07.

Because this claim is a species of fraud, a heightened standard of factual pleading applies. Under Federal Rule of Civil Procedure Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." The complaint must state the "who, what, when where, and how" of the fraudulent activity. *Kowalsky v. Deutsche Bank Nat'l Tr. Co.*, Civ. No. 14-07856, 2015 WL 5770523, at *8 (D.N.J. Sept. 30, 2015). "Where plaintiffs can demonstrate that specific information is in the exclusive control of the defendant, the Court relaxes the showing required under Rule 9(b). But Plaintiffs must still allege facts suggesting fraudulent concealment." *Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d 698, 703 (D.N.J. 2013) (internal citations omitted).

I first consider the fifth and final element of spoliation—that loanDepot "was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed." *Rosenblit*, 166 N.J. at 407. Because they depend on damage in the "underlying action," fraudulent concealment claims may be premature if brought within that action, before the exchange of discovery. *See Tafaro v. Six Flags Great Adventure, LLC*, No. CV175607FLWLHG, 2018 WL 1535289, at *7 (D.N.J. Mar. 29, 2018).

In the Amended Complaint, loanDepot has identified two activities with some degree of particularity. First, the Amended Complaint alleges that Reid instructed Manara to shred loanDepot's documents. (1AC ¶ 40). Instructing one's assistant to shred company documents on the eve of decamping to another company plausibly suggests concealment. That being said, I note that Reid also instructed Manara to scan the documents; if Manara did so, any such information may remain available and discoverable. Second, the Amended Complaint alleges that Reid has retained the laptop computer and has prevented loanDepot from accessing the data on it. (1AC ¶¶ 191(a), 197). The Court, of course, will turn a gimlet eye on any evidence of destruction that may emerge. But here too, the evidence on Reid's hard drive may turn up in discovery by the simple act of Reid's turning it over.[5]

Ordinary discovery procedures should reveal whether, for example, scanned copies of the shredded documents have become unavailable, or the laptop computer data has disappeared. The pendency of Count Eighteen will provide a basis for such discovery. For now, the motion to dismiss Count Eighteen is denied.[6]

### v. Count Nineteen

Count Nineteen asserts a claim against CrossCountry, Reid, and Manara for conspiracy to fraudulently conceal evidence. For the reasons discussed regarding Count Eighteen, the motion to dismiss Count Nineteen is denied.

---

[5] I also note that loanDepot claims that ESI has been deleted. (1AC ¶ 201). Such allegations lack the particularity necessary under Fed. R. Civ. P. 9(b).

[6] I do not imply, by the way, that destruction of evidence will be tolerated merely because it may be possible to recover or regenerate it by other means. Setting aside this substantive cause of action for spoliation, measures such as the adverse spoliation inference and monetary sanctions remain available. See e.g., Mosaid Techs. Inc. v. Samsung Elecs. Co., 348 F. Supp. 2d 332, 340 (D.N.J. 2004) (imposing the spoliation inference jury instruction and monetary sanctions). Of course, I take no position in advance on what are, at this stage, merely allegations.

### III.  Conclusion

For the reasons set forth above, I will GRANT IN PART and DENY IN PART the Defendants' motions to dismiss the Amended Complaint (DE 35, 36), as follows:

- As to **Count Eight**, the motion to dismiss is **GRANTED** as to allegations of tortious interference with the contracts of Albanese, Tempelman, and unnamed "others." The motions to dismiss are **DENIED** as to the allegations of tortious interference with the contracts of Lucia, Reid, Mellet, and Costakos.
- As to **Counts Ten, Fifteen**, **Eighteen** and **Nineteen**, the motions to dismiss are **DENIED**.

All dismissals are without prejudice to a properly supported, timely motion to amend. An appropriate order follows.

Dated: June 24, 2019

**Kevin McNulty**
**United States District Judge**